COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| GERARDO TREVIZO, | § | No. 08-12-0063-CR |
| Appellant, | § | Appeal from the |
| v. | § | 120th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20090D03033) |
| | § | |

## **O P I N I O N**

Gerardo Trevizo appeals his conviction on one count of aggravated sexual assault, TEX.PENAL CODE ANN. § 22.021, and one count of prohibited sexual conduct, TEX.PENAL CODE ANN. § 25.02. The jury found Trevizo guilty on both counts and assessed punishment at 35 years' for Count One and 10 years' for Count Two in prison. On appeal, Trevizo brings three challenges on evidentiary and constitutional grounds. In Issue One, Trevizo maintains that the admission of a medical record containing inculpatory statements made by the victim to a nurse constituted harmful evidentiary error and a violation of his rights under the Confrontation Clause. In Issue Two, Trevizo contends the trial court abused its discretion by admitting extrinsic impeachment evidence against a State witness under Rule 613 because the witness never unequivocally denied making certain statements to a police officer. In Issue Three, Trevizo argues that the trial court

erred by allowing the same State witness to testify at all because the State had prior notice the witness would be hostile, and it specifically sought to call the witness in order to admit inadmissible evidence though improper impeachment.   For the following reasons, we affirm.

## STATEMENT OF FACTS

Prior to his arrest and conviction in this case, Appellant resided in a single-family home in San Elizario, Texas, with his mother Ramona, his sister Rebecca Trevizo, his niece Alejandra Trevizo,[1] and Alejandra's children.   Rebecca is forty-one years' old.   At seven months of age, Rebecca contracted encephalitis from a mosquito bite, rendering her epileptic and permanently mentally disabled.   Rebecca's family members testified that Rebecca has the mental capacity of a child between the ages of five and seven, and that she interacts with Alejandra's children at their same intellectual level.   Rebecca speaks Spanish, but has some difficulty communicating and often uses her own idiosyncratic words and phrases to describe certain things.   As a result, family members sometimes have to "translate" what she means when she speaks to people who do not know her.   Rebecca can perform some limited self-care functions, including bathing herself. Rebecca still plays with "little dolls," is unable to drive a car, is unable to make adult decisions, and suffers from short-term memory loss.   Ramona testified that prior to 2009, Rebecca had never had sex, and that she did not understand what sex was.   Ramona is Rebecca's guardian and primary caretaker.   During her seizures, Rebecca sometimes loses continence, and that when that happens, Ramona washes Rebecca's clothes and tells Rebecca to take a shower.   Ramona also has to ensure that Rebecca does not injure herself during a seizure and provide Rebecca with oxygen to ensure that she can breathe during an epileptic attack.

---

[1] In her trial testimony, Alejandra stated that although Appellant was her uncle, she viewed him more as her brother. As such, he was repeatedly referred to as her brother at trial.   For purposes of clarity in the appellate record, we refer to him as her uncle and to Alejandra as his niece.

On May 5, 2009, Ramona and Alejandra went to pick up some items at the supermarket, leaving Appellant to supervise Alejandra's children as well as his sister Rebecca. When they returned, Ramona and Alejandra found Alejandra's children playing unsupervised in the living room and went searching for Appellant. What happened after Ramona and Alejandra reached the door of a back bedroom is in dispute. Ramona testified at trial that she could not recall what she saw on May 5, 2009, nor could she remember what she had told El Paso County sheriff's deputies that day beyond giving them her name and some other identifying information. Over Appellant's objection, the trial court admitted a redacted version of the deputy's report as State's Exhibit 72 and issued a limiting instruction to the jury that it should only consider the statement for impeachment purposes and not the truth of the matter asserted therein. Her statement to sheriff's deputies as relayed in the report reads as follows:

> I then entered my bedroom and noticed the door was closed. I then opened the door and saw my daughter, Rebecca Trevizo, lying on her back, on my bed. She was pulling up her pants. I also saw my son, Gerardo Trevizo, standing in front of her also pulling up his pants. . . . I spoke to Rebecca and asked what happened and she told me Gerardo put his penis inside her. I also found my daughter's underwear wet in the area of her vagina. I then told my daughter, Rebecca to shower due to the wet spot on her underwear. I believe Gerardo sexually assaulted my daughter Rebecca and wish to file charge.

At trial, Alejandra testified that when she got to the back bedroom, she only saw Appellant exiting the room and nothing else. As with Ramona, she also initially denied any memory of giving a statement inconsistent with her testimony to sheriff's deputies. The prosecutor then read from a statement Alejandra made to El Paso County sheriff's deputies in which she claimed she saw Appellant leaning over Rebecca, that Rebecca was in bed pulling up her underwear and pants, and that Appellant buttoned up his pants as well. When confronted when the police report, she

3

vacillated before finally admitting that the statements she gave in the police report were the truth.

Inside the bedroom, Appellant's mother and niece, Alejandra, confronted him and asked him what was going on. Appellant maintained that Rebecca had urinated on herself during a seizure, and that he was cleaning her up. Following a verbal altercation with his mother in which he handed her a steak knife and told her to kill him if she thought he actually raped his sister, Appellant called 911. Two deputies from the El Paso County Sheriff's Office arrived on the scene and interviewed all the family members. One of the deputies escorted Rebecca and Alejandra to Sierra Medical Center in El Paso. There, Sexual Assault Nurse Examiner ("SANE") Kathleen Justice performed a sexual assault examination and interviewed Rebecca through a telephonic translation service provided by AT&T that Sierra Medical Center uses to assist employees who do not speak Spanish. The translator, identified only by a four-digit number, relayed information over speakerphone between Rebecca and Justice, with Alejandra providing clarification when Rebecca used idiosyncratic words unfamiliar to the translator.

Justice, who was admitted as a sexual assault examination expert without objection at trial, testified that she obtained a DNA sample from Rebecca, performed a vaginal swab, and observed abrasions and redness around Rebecca's vaginal area. During the course of the exam, Rebecca made statements identifying Appellant as the man who sexually assaulted her. Specifically, Justice included the following statements in her notes:

> 5/5/09 2100 AT&T Operator #9019 Patient states that police brought her here when asked why she is here, Patient state that 'he was on top of her.' When asked who 'he' is she says 'Gerardo' her brother. Per sister, Rebecca's name for a man's member is 'talega.' When asked what he did with it she said 'he inserted it.' . . . Patient says this is the first time that he has done this. He said, 'Come here, Rebecca.' Then patient says he put his penis inside of her. When asked if this hurt, Rebecca said 'yes.' Then sister said he, Gerardo, called the police. Then she came here. K

4

Justice RN SANE

When the State moved to enter the medical records from that exam into evidence while Alejandra was on the stand, Appellant objected to the admission of the inculpatory statements on the basis that they were double hearsay and violated the Confrontation Clause. Following brief argument, the trial court held that the statements fell within the medical diagnosis exception to hearsay. The trial court also found that although the statements were testimonial in nature, Appellant's *Crawford* rights[2] were not violated because Rebecca was present in the courtroom and available for Appellant's cross-examination should he so elect to call her.[3] Appellant argued that Rebecca's mental condition rendered her "unavailable" for *Crawford* purposes, but the trial court overruled Appellant's objection. The trial court then admitted the medical records into evidence.

Separately, a detective from the sheriff's department obtained a search warrant and also took Appellant to Sierra Medical Center, where a technician collected an exemplar DNA sample from Appellant and performed several swabs on Appellant's penis. Additionally, sheriff's deputies seized a white t-shirt and a pair of plaid boxer shorts from the home and submitted them for forensic testing. At trial, the State's DNA analysis expert from the Texas Department of Public Safety crime lab testified that a penile swab from Appellant yielded DNA from both Appellant and Rebecca, and that both Appellant and Rebecca's DNA were found in epithelial cells collected from the plaid boxer shorts.

At the close of the State's case, Appellant moved for a mistrial based on the admission of the police report containing Ramona's prior inconsistent statements. The trial court denied the

---

[2] *Crawford v. Washington*, 541 U.S. 36, 126 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

[3] The State did not call Rebecca during its case-in-chief.

motion. Appellant also moved for a directed verdict, which was denied. Appellant then rested his case without offering any witnesses.

## DISCUSSION
### I.

In Issue One, Trevizo asserts that the trial judge abused her discretion when she admitted portions of medical records in which Rebecca relayed information about the sexual assault to Justice by way of a translator, arguing that the statements constituted inadmissible double hearsay. Trevizo also argues that his confrontation rights were violated because Rebecca's statements to Justice were testimonial, the translator is unavailable for cross-examination because her identity is unknown, and Rebecca is unavailable because by virtue of her mental disability, she is not a competent witness.

The State advances a five-fold response. First, the State contends that Trevizo did not properly preserve this issue for appellate review. Second, the State maintains that the third-party Spanish-language translator should not be seen as a separate link in the hearsay chain, but instead as merely a "language conduit" relaying information within a single level of hearsay (i.e. from Rebecca to Justice). Third, the State argues that within that single level of hearsay, the statements Rebecca made to Justice fell within a hearsay exception, since they were made for the purposes of medical diagnosis or treatment. Fourth, the State asserts that Trevizo's rights under the Confrontation Clause were not violated because Rebecca was present at trial and because her statements to Justice were relayed in the context of an ongoing emergency. Fifth, the State asserts that any error was harmless beyond a reasonable doubt.

We review this issue first for preservation, second for evidentiary error, and third for constitutional error, assessing harm where necessary.

6

## A. **Preservation of Error**

In its first rebuttal point, the State argues that Appellant failed to preserve the hearsay issue for appellate review, given that he did not object to the medical record in its entirety or provide any citation to the trial record showing he objected to the medical record in its entirety. The State also contends that Appellant objected only to the hearsay chain involving Alejandra translating for Rebecca at trial (i.e. from Rebecca to Alejandra to Justice). Because Appellant is challenging a hearsay chain in which an unidentified third party served as translator (i.e. from Rebecca to AT&T to Justice), the trial court had no opportunity to rule on that objection, and the variance between the two hearsay chains is fatal to Appellant's case.

To preserve an issue for appellate review, a party must offer a timely and sufficiently specific objection to the evidence presented and obtain a ruling from the trial court. TEX.R.APP.P. 33.1; TEX.R.EVID. 103(a); *see also Layton v. State*, 280 S.W.3d 235, 239 (Tex.Crim.App. 2009). "Identifying challenged evidence as hearsay or as calling for hearsay should be regarded by courts at all levels as a sufficiently specific objection, except under the most unusual circumstances." *Lankston v. State*, 827 S.W.2d 907, 910 (Tex.Crim.App. 1992). In addition to timeliness and specificity, the argument advanced on appeal must comport with the argument presented to the trial judge or else the error is waived. *Pena v. State*, 285 S.W.3d 459, 464 (Tex.Crim.App. 2009). In assessing whether any variance between the objection at trial and the argument presented for review is fatal, "we consider the context in which the complaint was made and the parties' shared understanding at that time." *Id*.

The State's first argument on preservation is conclusory, and we dispose of it quickly. The record clearly indicates that Appellant objected to two portions of the medical record that were

purportedly hearsay, even going so far as to read them aloud to the court. Appellant's counsel requested specific rulings on the hearsay and *Crawford* objections, which the trial court provided and from which Appellant asked for reconsideration. That is enough to preserve the issue for our review, and the State has offered no case law to the contrary. The State's first argument is without merit, and we disregard it. Likewise, the second argument is also flawed. The trial court engaged in a lengthy legal analysis involving an alleged hearsay chain from Rebecca through a translator to Justice. We find that is sufficient to present the issue before us for our review, regardless of whether Alejandra or the AT&T translator played the role of the middle link in the chain. *Cf. Lankston*, 827 S.W.2d at 910 (where hearsay objection rationale is clear from context, appellate court may properly review the trial ruling on the merits). Appellant's trial argument was enough to put the State on notice of what legal argument it would need to present on appeal. Error has been sufficiently preserved.

## B. **Hearsay**

In his first major sub-point presented in Issue One, Appellant contends the trial court erred by penetrating two levels of hearsay and admitting substantive inculpatory evidence without having a basis in the Texas Rules of Evidence for doing so.

### *Standard of Review*

We review evidentiary rulings, including those regarding the applicability of a hearsay exception, for abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex.Crim.App. 2007); *Walters v. State*, 247 S.W.3d 204, 218 (Tex.Crim.App. 2007). Likewise, we review rulings on whether the presence of a translator created multiple levels of hearsay for abuse of discretion. *Saavedra v. State*, 297 S.W.3d 342, 349 (Tex.Crim.App 2009). "A trial court abuses its

8

discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex.Crim.App. 2005); *accord Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App. 2010); *see also Lyles v. State*, 850 S.W.2d 497, 502 (Tex.Crim.App. 1993)(abuse of discretion occurs when trial court acts "without reference to any guiding rules and principles"). Evidentiary error "generally constitutes non-constitutional error and is reviewed under Rule 44.2(b)." *Walters*, 247 S.W.3d at 219. If an evidentiary error "does not affect [the defendant's] substantial rights," it "must be disregarded." TEX.R.APP.P. 44.2(b).

### *Translation as Additional Level of Hearsay*

At the outset, the State urges us in its second rebuttal point to view this issue as involving a single level of hearsay as opposed to double hearsay, since the AT&T Spanish-language translator served merely as a "language conduit" who neither added nor subtracted anything substantive to or from the hearsay chain. Appellant appears to contend that a translation *per se* constitutes an objectionable level of hearsay.

At common law, a translator constituted a separate link in the hearsay chain, thus creating an additional level of objectionable hearsay to be overcome before a statement could be admitted to prove the truth of the matter asserted. *Saavedra*, 297 S.W.3d at 344-45. However, the Texas Court of Criminal Appeals has recognized an exception to this rule where the declarant "actually authorized the interpreter to speak for him or adopted the interpreter as his agent[.]" *Id*. at 349. In determining whether the translator was the declarant's "agent" and was sufficiently reliable so as to function as a mere language conduit, we must resort to four factors: (1) "who supplied the interpreter[;]" (2) "whether the interpreter had any motive to mislead or distort[;]" (3) "the

9

interpreter's qualifications and language skills[;]" and (4) "whether actions taken subsequent to the translated statement were consistent with the statement as translated." *Saavedra*, 297 S.W.3d at 348; *see also Cassidy v. State*, 149 S.W.3d 712, 715-16 (Tex.App.--Austin 2004, pet. ref'd), *cert. denied*, 544 U.S. 925, 125 S.Ct. 1648, 161 L.Ed.2d 486 (2005)("Absent a motive to mislead, distort or some other indication of inaccuracy, when persons speaking different languages rely upon a translator as a conduit for their communication, the statements of the translator should be regarded as the statements of the persons themselves without creating an additional layer of hearsay."), *abrogated on other grounds by Wall v. State*, 184 S.W.3d 730 (Tex.Crim.App. 2006). No one factor in the *Saavedra* analysis is determinative. *Saavedra*, 297 S.W.3d at 349. We review the trial court's determination on the language conduit issue for abuse of discretion. *Id*.

Here, the trial court overruled Appellant's double hearsay objection but did not rule on how many layers of hearsay were at play or whether the AT&T translator served as a language conduit. We assume that if the trial court was not satisfied that the translator was duly authorized by the declarant, "it should [have] sustain[ed] a hearsay objection to the out-of-court translation" absent the presence of a supervening hearsay exception. *Id*. Since the trial court overruled the objection, and since the State only raised the medical exception to hearsay as between Rebecca and Justice and did not provide an exception that would have penetrated a second level of hearsay between the translator and Justice, we assume that the trial judge only found one level of hearsay and that the translator was a language conduit by implication.

Next, we view that implicit ruling in light of the *Saavedra* factors to determine whether the trial judge acted "without reference to any guiding rules and principles" in finding only a single level of hearsay. *Lyles*, 850 S.W.2d at 502 (setting out abuse of discretion standard). Under the

10

first *Saavedra* factor, the fact that the hospital provided the translator as part of its standard operating procedure weighs in favor of the translation's reliability and neutrality. There is no affirmative evidence in the record that would indicate the AT&T interpreter had any motive to mislead the nurse or distort Rebecca's testimony under the second *Saavedra* factor. However, there is also no evidence in the record indicating the translator's identity, qualifications, educational background, language ability, or the like, which cuts against the trial court's ruling under *Saavedra* factor three. The State urges us to infer that the translator must have been qualified by virtue of the fact that he or she was provided as part of a dedicated service by AT&T. We decline to indulge that inference absent an independent basis in the record beyond Justice's testimony that the translator purportedly worked for AT&T.

Nevertheless, the last factor in this case is persuasive. We find that under factor four, actions taken after the statement was translated were consistent with the translated statement because the conversation between Rebecca and Justice continued on unabated. The strongest indicator that Rebecca adopted the translator as her "agent" was the fact that she continued to address Justice throughout the duration of the sexual assault exam. Further, the statement has independent indicia of reliability. *See Saavedra*, 297 S.W.3d at 349 (recognizing that "the ultimate reliability of the proffered evidence [is] always a core consideration in fashioning any exception to the general rule against admitting hearsay evidence over objection"). The statements the neutral-party translator relayed to Justice from Rebecca were substantively identical to the statements that biased declarants Alejandra and Ramona relayed to El Paso County Sheriff's Office deputies from Rebecca shortly after she made her outcry.

As such, we find that the trial court did not abuse its discretion in implicitly finding that

11

Rebecca adopted the AT&T translator as her "agent" for hearsay purposes, and that only one level of hearsay existed between Rebecca and Justice.

### *The Medical Diagnosis Exception to Hearsay*

In its third rebuttal point on this issue, the State contends that within the single level of hearsay found by the trial court, Rebecca's statements fall within the medical diagnosis exception to the hearsay rule.

As a general matter, out-of-court statements offered at trial for the truth of the matter asserted therein constitute hearsay and are inadmissible. TEX.R.EVID. 801(d); TEX.R.EVID. 802. The Texas Rules of Evidence provide a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." TEX.R.EVID. 803(4). The State has provided numerous citations from our sister circuits holding that the identity of an offender falls within the ambit of this hearsay exception because it is relevant to treatment, particularly in incest and family violence cases, insofar as it presents an environmental and safety issue that could frustrate diagnosis and treatment. *See*, *e.g.*, *Bargas v. State*, 252 S.W.3d 876, 896 (Tex.App.--Houston [14th Dist.] 2008, no pet.)(identity of child abuser medically relevant because treatment could include removing child from abusive environment); *Beheler v. State*, 3 S.W.3d 182, 189 (Tex.App.--Fort Worth 1999, pet. ref'd)(same).

We agree. Given the circumstances of this case and the family relationship between the accuser and the defendant, the identity of Rebecca's assailant was "reasonably pertinent to diagnosis or treatment," *Bargas*, 252 S.W.3d at 896, because it allowed Justice to assess whether

12

Rebecca's home environment was a factor posing a continuing health risk to Rebecca. The inculpatory statements fall squarely within the hearsay exception outlined in TEX.R.EVID. 803(4) and the trial court did not abuse its discretion by admitting them. Appellant's first major sub-point in Issue One is overruled.

### C. Confrontation Clause

In his second major sub-point in Issue One, Appellant argues that the admission of Rebecca's hearsay statements is prohibited under the Confrontation Clause because even though Rebecca was present in the courtroom during trial, he could not effectively cross-examine her by virtue of her mental disability.

### *Standard of Review*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. Amend. VI. This federal constitutional protection has been incorporated against the states through the Fourteenth Amendment. *See generally Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965). The Confrontation Clause places certain restrictions on the use of hearsay from non-testifying declarants, but "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 124 S.Ct. 1354, 1369 n.9, 158 L.Ed.2d 177 (2004). "[T]o implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature." *Woodall v. State*, 336 S.W.3d 634, 642 (Tex.Crim.App. 2011), *citing Crawford*, 541 U.S. at 50-52, 59, 124 S.Ct. at 1363-65, 1368-69. Once both those conditions have been met and the

Confrontation Clause has been implicated, the admission of testimonial hearsay is constitutionally barred unless both "(1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant." *Woodall*, 335 S.W.3d at 642.

We review constitutional rulings, including whether a statement is "testimonial" for Confrontation Clause purposes, *de novo*. *Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006). Admission of testimonial statements in violation of the Confrontation Clause is reviewed for harmlessness beyond a reasonable doubt. *Id*. at 746; *see also* TEX.R.APP.P. 44.2. "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *Wall*, 184 S.W.3d at 746. However, "the presence of other overwhelming evidence" on point "may be an important factor in the evaluation of harm." *Id*.

*Analysis*

On these facts, we find that the Confrontation Clause has not been implicated because Rebecca was not absent from trial, and we have no justification to depart from the presumption that she was competent to testify. The trial record indicates that although the State did not call Rebecca in its case-in-chief, Rebecca was physically present for trial—subject to the rule—at the time the State sought to admit her hearsay testimony. In *Woodall*, the State read into the record a statement made by a declarant who had been present earlier as a defense witness but who could not be found when recalled to the stand for rebuttal. 336 S.W.3d at 641. The trial judge offered to issue a writ of attachment to bring her to the stand for cross-examination, but the defendant refused, arguing that the writ would be a "useless exercise in futility" because the witness's memory loss made her "unavailable" under TEX.R.EVID. 804(a)(3). *Id.* at 645. The Court of

14

Criminal Appeals held that the predicate "absence" implicating *Crawford* and "unavailability" as defined in the *Crawford* analysis and the Texas Rules of Evidence were two separate concepts, and that "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." *Woodall*, 336 S.W.3d at 642, *citing California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970). Because the witness was within the court's attachment power despite not being physically present, she was not "absent" from trial and the Confrontation Clause was not implicated. *Id.*

Here, the circumstances are very similar to *Woodall*. The State declined to call Rebecca in its case-in-chief. However, she was present at trial subject to the court's attachment power, and could have been called to testify by either the State or Appellant. Notably, Appellant never attempted to call Rebecca as a witness. Although family members testified that Rebecca displayed some difficulty communicating, Appellant did not at any point request that the court assess and rule on Rebecca's competency as a witness, meaning that we must presume she would have been a competent witness. *See* TEX.R.EVID. 601(a)("Every person is competent to be a witness except as otherwise provided in these rules."). The trial court admonished Appellant that he could call Rebecca to the stand if he wished to examine her on the statements she made to the nurse, and like *Woodall*, Appellant merely complained to the trial court during his objection that calling Rebecca to the stand would be futile because her mental handicap rendered her "unavailable" under the Rules of Evidence. However, a criminal defendant is estopped from complaining on appeal that his Confrontation Clause rights are violated where he has the opportunity to actually call his accuser to the stand and refuses based on purported futility under

15

the Rules of Evidence.   *Woodall*, 336 S.W.3d at 644-45.

The Sixth Amendment affords a criminal defendant the extraordinary power to force a witness to be subject to probing, often traumatic cross-examination in front of a jury before the State may lawfully convict the defendant of a crime.   *See Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370 (noting that the Framers of the Constitution viewed the adversarial process of "testing [evidence] in the crucible of cross-examination" as a vital procedural safeguard in criminal trials). Our Constitution makes no exceptions to this fundamental principle, even in cases where the witness may be a vulnerable individual who has been sexually assaulted by a family member. *See*, *e.g.*, *De La Paz v. State*, 273 S.W.3d 671, 680-81 (Tex.Crim.App. 2008)(reversing aggravated sexual assault conviction where State failed to offer any affirmative evidence establishing that seven-year-old girl's outcry statements to a social worker that were admissible under the Rules of Evidence were also admissible under *Crawford*).

But the other side of the *Crawford* coin is that if the witness is physically present when her statement is offered and she may be brought to the stand via a writ of attachment, then there is no constitutional basis for complaint.   *Woodall*, 336 S.W.3d at 642.   The defendant must call the witness for cross-examination or else he forfeits his *Crawford* objection.   *Id*.   "To hold otherwise would be to permit him to take advantage of his own wrong."   *Id*. at 644.   Although the trial court may ultimately find that a witness's mental illness or condition does not render her incompetent to testify and thus bring the defendant face-to-face with a mentally handicapped hostile witness, such is the risk inherent in confrontation.   "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."   *Woodall*, 336 S.W.3d at 643, *citing Delaware v.*

*Fensterer*, 474 U.S. 15, 19, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)(per curiam)[Emphasis in original]. In any event, without a trial ruling on the witness's competence, we are without jurisdiction to assess whether her mental condition rendered her constructively "absent" from the trial and "unavailable" for *Crawford* purposes. *See Davis v. State*, 313 S.W.3d 317, 347 (Tex.Crim.App. 2010)(Confrontation Clause claims must be preserved through timely and specific objection ruled upon by the trial court).

We need not reach the issues of whether Rebecca's statements to the nurse were testimonial or whether her mental state rendered her unavailable under *Crawford.* Under these facts, Appellant is not entitled to a *Crawford* analysis. Rebecca was physically present in the courtroom subject to the rule for the duration of the trial, and Appellant had ample opportunity to call her for cross-examination and place her competency to testify at issue. By failing to call her to the stand, Appellant invited the constitutional error and has, therefore, waived his ability to bring a *Crawford* challenge on appeal. As such, we find no justiciable Confrontation Clause issue before us.

Issue One is overruled in its entirety.

## II.

In his final two issues, Appellant lodges complaints against the admission of a sheriff's office report containing Ramona's prior inconsistent statements on alternating grounds. In Issue Two, Appellant argues that Ramona's impeachment was procedurally defective under TEX.R.EVID. 613(a) because Ramona did not unequivocally deny making the statement before the police report was admitted as extrinsic evidence of prior inconsistent statements. In Issue Three, Appellant contends that the trial court abused its discretion by allowing the State to call Ramona at

17

all, alleging that the State knew she would be a hostile witness and intended to use her merely as a vehicle to admit otherwise inadmissible hearsay testimony from the police report. We assess each purported error for abuse of discretion. *Cameron*, 241 S.W.3d at 19.

## A. Admission of Extrinsic Impeachment Evidence

In Issue Two, Appellant contends that the trial court abused its discretion by admitting portions of the police report into evidence because Ramona never unequivocally denied making certain statements to a sheriff's deputy. The State responds that Ramona's purported memory loss about the content of her discussion with the sheriff's deputy was sufficient to allow the trial judge to admit the report.

TEX.R.EVID. 613 allows for extrinsic evidence of a witness's prior inconsistent statements to be admitted for impeachment purposes where the witness has been asked about the time, place, and circumstances of the statement and "afforded an opportunity to explain or deny such statement." TEX.R.EVID. 613(a). "If the witness unequivocally admits such bias or interest, extrinsic evidence of same shall not be admitted." *Id.* However, if the witness denies making the statement or equivocates on whether he made the statement, the trial court may properly admit the prior inconsistent statement into evidence. *See McGary v. State*, 750 S.W.2d 782, 787 (Tex.Crim.App. 1988). "Statements need not be explicitly contradictory to be in conflict . . . and an inconsistency between testimony and a prior statement may arise from an evasive answer or feigned inability to remember." *Gallegos v. State*, Nos. 01-08-00606-CR, 01-08-00607-CR, 01-08-00608-CR, 2009 WL 793825, at \*4 (Tex.App.--Houston [1st Dist.] Mar. 26, 2009, pet. ref'd)(mem. op., not designated for publication), *citing United States v. Bigham*, 812 F.2d 943, 946-47 (5th Cir.1987). "If the witness admits making . . . written statements but upon inquiry

18

denies portions of the statement, then the portion that contradicts the witness and only that portion may be proven for the purpose of impeachment." *McGary*, 750 S.W.2d at 787.

Here, Ramona repeatedly denied any memory of what happened on May 5, 2009 beyond going to the grocery store with Alejandra and admitted at the outset of her testimony that she did not want to testify against her son and that she was reluctant to talk about the facts of the case. Ramona initially claimed not to remember returning from the market and seeing her grandchildren unsupervised in front of the house, but admitted that she remembered walking into the house and not seeing her grandchildren or anyone else there. She also stated at first that she did not recall making a statement to a sheriff's deputy. She further said she did not remember telling the deputy that she walked to her bedroom or noticing that the bedroom door was closed. She also denied any memory of telling the sheriff's deputy that she saw her daughter in bed, on her back, and pulling her pants up, or that she also saw Appellant pulling his pants up. She said she did not remember telling the sheriff's deputy that Rebecca had said Gerardo put his penis inside her, or that she believed Appellant had committed a sexual assault.

After asking her about her statement line by line, the State offered Ramona's statement to the sheriff's deputy into evidence a total of three times. The first time, the trial court instructed the State that it would not admit the document unless Ramona specifically admitted or denied making the statements and gave her an opportunity to explain the discrepancies between the statement and her testimony. After again asking Ramona about her memory of the statements, the State moved to admit the evidence a second time, and the trial court again refused to admit the evidence unless Ramona stated that the statements were untrue and not just that she did not remember making them. The State then proceeded to question Ramona a third time, and Ramona

19

finally conceded that she made self-identifying statements to a sheriff's deputy. She also admitted that she told the deputy she had gone to the San Elizario supermarket and returned home around 3:30 p.m. However, she continued denying any memory of telling the sheriff's deputy that her grandchildren were unsupervised when she returned home, that she saw her bedroom door was closed, that she saw her daughter and her son pulling up their pants, or that Rebecca had told her Appellant had put his penis inside her.

The State then offered the sheriff's report into evidence a third time, and Appellant objected on the basis of hearsay and improper impeachment. The trial court redacted Ramona's name, date of birth, age, address, and residence; references to her giving the statement of her own free will; her statement that she went to the market to buy groceries and returned home at 3:30 p.m.; her statement that her grandchildren were unattended; and her statement that she entered the house and did not see anyone. The judge reasoned that those portions should be redacted on the basis that Ramona had admitted the truth of those statements. Then the trial court admitted the remaining portions of the sheriff's report as extraneous impeachment evidence in light of Ramona's purported memory loss, and issued a limiting instruction to the jury that it should use the report to decide whether Ramona was a credible witness and not for the truth of the statements therein.

The evidence in the record shows that Ramona was given the opportunity to explain the statements she made to the sheriff's deputy. She repeatedly denied any memory of what she told the deputy and repeatedly stated that she did not know what happened that day. In viewing the testimony as a whole, we believe that Ramona's testimony that she did not remember what happened that day contradicted her statements to the deputy. *See Aguilar v. State*, No.

20

14-07-00362-CR, 2008 WL 5058974, at \*2 (Tex.App.--Houston [14th Dist.] Dec. 2, 2008, no pet.)(mem. op., not designated for publication)(no abuse of discretion where statements admitted when witness denied memory of statement).  We also find that the trial judge gave Ramona several opportunities to explain herself.  As such, the formal requirements of Rule 613(a) were met.  The trial judge did not abuse her discretion in admitting Ramona's prior inconsistent statements coupled with the limiting instruction to the jury.

Issue Two is overruled.

## B.  Hostile Witnesses as Vehicles to Admit Otherwise Inadmissible Hearsay

In Issue Three, Appellant contends that the trial court abused its discretion in conducting a Rule 403 balancing test under *Hughes v. State*, 4 S.W.3d 1, 5 (Tex.Crim.App. 1999), when it allowed the State to commit subterfuge by offering a hostile witness solely to admit inadmissible evidence through impeachment.  The State points to our unpublished decision in *Castro-Valenzuela v. State*, No. 08-08-00317-CR, 2010 WL 2949963 (Tex.App.--El Paso July 28, 2010, pet. ref'd)(not designated for publication), and contends that Appellant failed to preserve the error by objecting to Ramona being called as a witness.  The State paints with too broad a stroke in construing *Castro-Valenzuela*'s holding, but is ultimately correct about preservation. *Castro-Valenzuela* does not state that a party must lodge a *Hughes* objection prior to the calling of a witness.  Rather, in *Castro-Valenzuela*, the appellant objected on *Hughes* grounds only once during voir dire.  2010 WL 2949963, at \*5.  The court never ruled on his objection and instead asked him to re-urge it during direct testimony, when the objection would be ripe for review.  *Id.* The appellant then never made any subsequent objection.  *Id.*  Thus, the defendant failed to preserve error by making a proper, timely objection and obtaining a ruling as required by the Rules

21

of Appellate Procedure. *Castro-Valenzuela*, 2010 WL 2949963, at *5.; *see also* TEX.R.APP.P. 33.1(a)(1); 33.1(a)(2).

Here, we also find that Appellant has failed to preserve the error for our review. Appellant has not directed us to anything in the record we can construe as an objection to Ramona being called as a witness for the sole purpose of subverting the Rules of Evidence to admit improper hearsay. *See* TEX.R.APP.P. 38.1(i)(appellant's brief must contain "appropriate citations to authorities and to the record"). Our own search of the record shows that Appellant's counsel lodged an objection on the basis of hearsay and improper impeachment after the State had gone through the sheriff's deputy report line by line at least twice asking Ramona to admit or deny making the statements contained in the report. Appellant's counsel made a few stray remarks to the judge about Ramona's ability to give substantive testimony, and he insinuated that the State intended to call Ramona for improper impeachment. However, he failed to make any legal objection. As such, we find that the error has not been preserved.

Issue Three is overruled. We affirm the trial court's judgment.


January 22, 2014
                                        YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)

22